IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORMAN B.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 C 1042 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381a, 1382c, over three years ago in October of 2018. (Administrative Record (R. 271-76) ). He claimed that he had been disabled since June 24, 2018, due to gunshot wounds. (R. 271, 289). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on February 23, 2021. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on February 25, 2021. [Dkt. #8]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

### A.

Plaintiff was born on March 16, 1984, making him just 34 years old when he claims he became unable to work – having never worked before in his life– and just 36 years old when the ALJ found him not disabled. (R. 16-37, 271, 289). Plaintiff had previously been receiving SSI, but SSI is terminated when one is incarcerated (R. 65), and plaintiff has been incarcerated a few times: for unlawful use of a firearm, selling cocaine, robbing a convenience store, chasing someone with a knife, and for assaulting a police officer. (R. 85, 129-132). He drinks alcohol and smokes marijuana. (R. 76). In terms of education, plaintiff has testified that he cannot say when he quit school (R. 67), and he has testified that he dropped out of high school in the 10th grade. (R. 290, 563). He also said he was unable to complete his GED. On that topic, he has testified that he does not know why (R. 68), and he has also said it was because he was arrested and incarcerated. (R. 564).

Plaintiff claims that because of bullets in his back, he can stand for only 30 to 45 minutes at a time, and sit for 45 minutes to an hour. (R. 70-71). He says he can't do much with his left arm because there is a rod in it, and he can't do much with his right arm – he is right-handed – because he is missing part of his middle finger. (R. 72). He lives with his cousin and her four children: two boys aged 13 and 16, and two girls aged 6 and 9. (R. 77). He gets a Link card for groceries for himself and his cousin's family. (R. 79).[2] He is able to pay bills, count change, handle a savings

---

[2] Plaintiff, represented by counsel, swore under penalty of perjury on his application to proceed *in forma pauperis*, that he received no public assistance or income of any kind. [Dkt. #3, Par. 3, Dkt. ## 4-6]. When the court questioned his application, he filed a statement admitting that he received an EBT from the USDA. [Dkt. #12]. The court reminds counsel, for future reference, that disability or lack of income is no
(continued...)

account, and write checks and money orders. (R. 305).

The medical record in this case is not extensive as these cases go, covering about 1000 pages. (R. 404-1427). As is often the case, very little of it appears pertinent to the plaintiff's claim for benefits. Indeed, the plaintiff's brief points to just 30 pages or so, focusing extensively on a report of a consultative psychiatric exam plaintiff had with Dr. Levitan in connection with his application for SSI. [Dkt. #19, citing R. 406, 413, 416, 427-28, 432, 447, 560, 572, 576, 1352, 1389-1414, 1416-18].

The medical record shows that plaintiff suffered gunshot wounds in the summer of 2018, and was treated and had extensive surgery at the end of June and the beginning of July. (R. 1389-1414). Thereafter, plaintiff's issues have been limited to abdominal pain and cramps. On October 22, 2018, plaintiff sought treatment for nausea and vomiting. (R. 1373). Musculoskeletal exam showed normal range of motion and normal strength. (R. 1374). A pancreatic pseudocyst was found and drained with a stent. Post-operatively, plaintiff's pain was controlled, and he was ambulating. (R. 1380, 1382).

On November 2, 2018, plaintiff returned for treatment due to persistent abdominal cramps. (R. 1384). Exam revealed no pain other than abdominal complaints; no back or muscle pain. (R. 1384). Range of motion was normal throughout. (R. 1385). Speech was normal, and there were no psychiatric deficits noted. (R. 1385). At a November 16, 2018 intake exam, plaintiff was noted to

---

[2](...continued)
excuse for filing a false *in forma pauperis* application. *See Lofton v. SP Plus Corp.*, 710 F. App'x 265, 266 (7th Cir. 2018)(refusing to consider claims of disability and loss of pension and reinstate case dismissed for false in forma pauperis petition); *see also Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016)(affirming dismissal of case where plaintiff failed to disclose $1,400 trust account); *Coleman v. Calumet City*, 754 F. App'x 468, 469 (7th Cir. 2019)(affirming dismissal of case where plaintiff failed to disclose gifts and $1,745 in income).

be fearful, but concentration was focused, recent and remote memory were normal, speech was slower paced but clear and understandable, judgment and insight were appropriate. (R. 1389). Plaintiff chose not to return for therapy. (R. 1418).

On December 2, 2018, plaintiff returned with complaints of cramping and abdominal pain again. (R. 1419). He had no other complaints. (R. 1419-20). Neurological exam was normal, and his mood and affect were appropriate. (R. 1422). He was medicated, his pain improved, and he was discharged. (R. 1422).

About a month later, on January 3, 2019, plaintiff had a consultative exam with psychiatrist Dr. Levitan in connection with his October 2018 application for SSI. In stark contrast to the previous six months of medical records and exams, plaintiff came to the appointment in a wheelchair pushed by a female family friend. (R. 427). He reported that he had been in special education classes in school and had quit school when he was 12 years old. He said he had been in prison "two to four different times", the last stint ending two years ago. (R. 426). Plaintiff said he was unable to wash himself and other people managed financial matters for him. (R. 427). The doctor said plaintiff appeared "spacey-like" – the doctor's word – and mumbled softly when speaking. Plaintiff said he didn't know the month but knew it was near Christmas. Dr. Levitan noted "[d]ifficulties and inconsistencies were grossly noted with both his recent and remote memories." He said plaintiff's judgment seemed questionable. He said plaintiff's affect, again, was "spacey-like." The doctor said "[h]e appeared to have a very noticeably below-average intelligence." Dr. Levitan noted that there was "reported mild to moderate mental retardation." His diagnosis was mixed personality disorder with avoidance, borderline social features; medical problems associated with past gunshot wounds;. (R. 428). The doctor felt plaintiff would have difficulty performing even simple and routine tasks,

4

handling mild work stress, adequately communicating with supervisors and coworkers. He could follow simple instructions, but not retain them through the day. The doctor questioned plaintiff's capacity to manage his own funds. (R. 428).

At some point in the next four months, plaintiff was able to commit aggravated battery against a police officer; he was apparently no longer confined to a wheelchair at the time. Having violated parole, he was back in prison by April 2019. And examinations went back to normal, in stark contrast to plaintiff's visit with Dr. Levitan. At Stateville intake on April 11, 2019, contrary to how he would testify at his administrative hearing – and what he told Dr. Levitan – plaintiff said he had a high school education and had never received SSI. (R. 46). It was noted that plaintiff's memory and concentration were intact, his speech was normal, his attention was normal, and his thought content and affect were unremarkable (R. 47). On April 12, 2019, it was noted that he had no mobility problems; no assistive devices were needed (R. 40). Strength and range of motion were within normal limits. (R. 58). On April 15, 2019, there was no evidence of cognitive deficit or formal thought disorder; and memory and concentration intact (R. 52). As before, the plaintiff's complaints were exclusively abdominal and food related. (R. 44-45, 51, 55). On April 28, 2019 he asked to be taken off his no meat diet. (R. 42).

## B.

After an administrative hearings at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following lengthy list of severe impairments:

> a history of multiple gunshot wounds requiring an exploratory laparotomy, left nephrectomy and ureterectomy, distal pancreatectomy, splenectomy, distal gastrectomy, left lateral segmentectomy of the liver, and stomach repair open

abdomen with VAC placement; severely comminuted intra-articular fracture involving the left 1st metacarpal; comminuted fracture involving the distal phalanx of the 3rd right digit; comminuted left supracondylar displaced fracture; gastroparesis; epilepsy; asthma; personality disorder; major depressive disorder; neurodevelopmental disorder (also referred to in the record as mental retardation); and history of alcohol dependence and cannabis dependence (R. 21). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for asthma, digestive system impairments, epilepsy, and mental impairments. (R. 22-25). The ALJ determined that the plaintiff had a moderate limitation in understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. (R. 23-24).

The ALJ then determined that plaintiff could perform sedentary work with the following list of additional limitations:

> The [plaintiff] cannot climb ladders, ropes, or scaffolds, or crawl. The [plaintiff] can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. The [plaintiff] can frequently reach, handle, and finger with the bilateral upper extremities. The [plaintiff] cannot work around hazards, such as unprotected heights and exposed, moving, mechanical parts. The [plaintiff] cannot tolerate more than occasional exposure to vibration, extreme cold, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. The [plaintiff] can understand, remember, and carry out simple work instructions and can sustain concentration to perform simple, routine, repetitive tasks. The [plaintiff] can adapt adequately to work situations and changes that occur in the usual workplace with reasonable support, but is likely to perform more successfully in a work environment with routine tasks and clear expectations. The [plaintiff] would function best in an environment where activities and goals are determined for him rather than having him plan activities independently. The [plaintiff] can interact occasionally and superficially with coworkers and supervisors performing job duties that do not involve tandem tasks or teamwork. The [plaintiff] should have no more than incidental contact with the public.

(R. 26).

In addition, the ALJ then summarized the plaintiff's allegations and determined that the

plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 26-27). The ALJ then discussed the medical record, including the surgery plaintiff had following gunshots wounds in June of 2018, and two additional hospitalizations for related treatment in October and December of 2018. Thereafter, the ALJ noted that physical exams were mostly normal. (R. 27-28). The ALJ then discussed the medical record in terms of mental impairments, noting that plaintiff had a violent criminal history, and low IQ scores in the remote past. In this regard, the ALJ further noted that, at a 2008 assessment, plaintiff's sincerity of effort was questioned and, more recently, there were inconsistencies in some of plaintiff's answers. (R. 28).

As for medical opinions, the ALJ found the opinion from the consultative examiner, Dr. Levitan, that plaintiff would be unable to perform even simple work, unpersuasive. The ALJ explained that there were validity issues at the consultative exam and it was questionable whether plaintiff was putting forth a valid effort. The ALJ found the opinions from the state agency reviewing physicians that plaintiff could perform light work with some restrictions somewhat persuasive. The ALJ found that additional restrictions were warranted based on the totality of the evidence. The ALJ found the opinions from the state agency reviewing psychologists that plaintiff could perform work involving simple tasks with minimal contact with co-workers and the public persuasive as they were supported by the plaintiff's diagnoses, questionable performance on intelligence testing, and lack of more recent mental health treatment. (R. 29-30).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff perform

jobs that existed in significant numbers in the national economy, such as: circuit board assembler (DOT #726.684-110, SVP 2, sedentary light exertion, 34,000 jobs); addresser (DOT #209.587-010, SVP 2, sedentary exertion, 12,600 jobs); or table worker (DOT#39.687-182), SVP 2, sedentary exertion, 5,000 jobs). (R. 31-32). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 32).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

But, in the Seventh Circuit, the ALJ also has had for many years an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). The court has said it must be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v.*

*Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build what *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) called the "logical bridge" between the endeavor and the result: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."[3] *See also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)("The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.").

But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d

---

[3] The "logical bridge" requirement made its first appearance in Social Security cases in Judge Posner's opinion in *Sarchet*. However, its phrasing traces its lineage to Judge Spottswood Robinson's opinion in the non-Social Security case of *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), where Judge Robinson said: "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167.

284, 287-88 (7th Cir. 1985).[4] But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the doctrinal equivalent of the Pont Neuf. *See also Brumbaugh v. Saul*, 850 F.App'x. 973, 977 (7th Cir. 2021)("the 'logical bridge' language in our case law is descriptive but does not alter the applicable substantial evidence standard.").

### III.

The plaintiff has three arguments for overturning the ALJ's decision. The first is that the ALJ erred in rejecting the opinion of consultative examiner, Dr. Levitan. The plaintiff accuses the ALJ of relying on a cherry-picked review of the evidence. The second is that the ALJ's residual

---

[4] Prior to *Sarchet's* "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that the ALJ had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted," but only "a minimal level of articulation of the ALJ's assessment of the evidence ... in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do.... This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287 (citations omitted).

10

functional capacity finding is not supported by substantial evidence. Third, and finally, the plaintiff argues that 52,000 job is not a significant number. Any other arguments plaintiff might have raised are deemed waived. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir.2013); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000).

### A.

We begin with the ALJ's rejection of Dr. Levitan's report from the January 2019 consultative exam. A claimant is not disabled simply because his treating physician says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The ALJ found the report "unpersuasive" because it was inconsistent with the totality of the evidence. (R. 29). That's putting it mildly. One day plaintiff's only physical complaint is that he has abdominal pain, and both physical exams and mental status exams are normal. Range of motion and strength are normal. Attention, concentration, thought process, and judgment are normal. Speech is normal and coherent, albeit slow on one occasion. The next day, plaintiff is confined to a wheel chair and mumbling incoherently. His mental and intellectual functioning are so severely impaired that it is obvious to Dr. Levitan that he was "moderately mentally retarded." Once that exam was over, however, plaintiff no longer had need of his wheelchair, was physical able to assault a police officer, and prison mental records suggested a return to the plaintiff's previous reality: essentially normal mental and physical status, aside from abdominal issues.

An ALJ doesn't have to buy a doctor's opinion, of course. No expert's opinion in any kind of case is automatically entitled to the weight of an encyclical. But to reject it, he has to provide reasoning that is supported by the record. The ALJ's reason for rejecting Dr. Levitan's report – that it was inconsistent with the other evidence – is completely valid. *Prill v. Kijakazi*, 23 F.4th 738 (7th

11

Cir. 2022) *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015). Dr. Levitan's opinion is so clearly an outlier than one would have to question the ALJ's judgment had he *not* rejected it.

The plaintiff argues that there is evidence in the record to support Dr. Levitan's findings, but in the main, the plaintiff points to his own claims. It bears repeating that, here as elsewhere, allegations, alone, of course, may not be the basis of an award of benefits. *Zoch*, 981 F.3d at 601; 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. § 416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). It is the plaintiff's burden to prove she is disabled by providing medical evidence in support of her claims. *See Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. Feb. 23, 2021); *Sosh v. Saul*, 818 F. App'x 542, 546 (7th Cir. 2020); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, ...."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 416.912(c)("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

And, along those lines, a doctor's opinion is of little value if – as it appears Dr. Levitan's was – it is based primarily upon a patient's subjective complaints. *Prill v. Kijakazi*, 23 F.4th 738 (7th Cir. 2022); *Zoch*, 981 F.3d at 602; *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). ALJs have to rely on medical opinions "based on objective observations," not "subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019);

12

*Elder v. Astrue*, 529 F.3d 408, 413, 416 (7th Cir. 2008).

To the extent there is medical evidence contrary to the ALJ's assessment of Dr. Levitan's opinion in the record, does not mean that assessment was not supported by "substantial evidence." Substantial evidence, it must be remembered, does not have to even be a preponderance. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007). The court is not allowed to reweigh the evidence. *Reynolds v. Kijakazi*, _F.4th_, 2022 WL 291721, at *3 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). As the summary of the medical record before and after plaintiff's visit with Dr. Levitan shows, the preponderance of evidence – not just substantial evidence – goes against plaintiff's argument.

Additionally, as the ALJ noted, it was not unheard of for plaintiff to take a psychological exam or IQ test in an attempt to secure SSI. Plaintiff had a consultative exam in connection with a previous application for benefits back in September of 2008, and his verbal IQ score was 59, Performance IQ was 49, and Full Scale IQ was 50. The results were within the moderate range of mental retardation, but the doctor said "[d]espite repeated urgings, there were validity issues." He "did question whether [the plaintiff] was putting forth a valid effort." (R. 559). The doctor "could not rule out the possibility of deliberate failure." (R. 560). Perhaps things like this, and the record before and after the exam, or the lack of any physical issues that would require a wheelchair, are why the ALJ "read suspicion into Dr. Levitan's report" [Dkt. #19, at 9], rightfully so.

In any event, the evidence that supposedly detracts from the ALJ's rational is not terribly compelling. For the most part, plaintiff grasps at straws – or cherry picks – to offer evidence that he is mentally disabled. For example, plaintiff suggests that because he did not testify more confidently about the ages of his cousin's children [Dkt. #19, at 9 citing R. 77 ("The oldest I think

is 16..., and the other boy – he like 13, maybe. And her daughters – 9 and 6, maybe"), it indicates he has memory problems – despite status exams to the contrary. Curiously, plaintiff's brief doesn't say he got those ages wrong, suggesting he got them right or wasn't far off. *See Crosby v. Buchanan*, 90 U.S. 420, 457 (1874) ("Honesty of purpose prompts frankness of statement. Concealment is indicative of fraud."). But, in any event, if the claimed inability to recall exactly the ages of a *cousin's* four children was evidence of disability, the Fund would be quickly exhausted. Additionally, plaintiff submits that his cousin reported that he cannot manage his own funds, count change, or pay bills because he is "irresponsible." [Dkt. #19, at 10, citing R. 322]. Not only was the ALJ entitled – indeed, required – to make a credibility determination about this claim, but the ALJ was also aware of the contrary testimony from plaintiff's friend with whom he also stayed who said he was able to pay bills, count change, manage money, and write checks. (R. 305). The ALJ was, of course, not obligated simply to credit the testimony of the cousin and disregard of the contrary testimony. That is not the way credibility determinations are made.

Plaintiff also points out that he is a violent criminal[5], and has been belligerent with hospital staff on two occasions, in 2014 and 2018. [Dkt. #19, at 13]. But, there's not much in those two isolated incidents. On the former occasion, he was railing against being in police custody – the police had taken him to the hospital after his convenience store robbery arrests. (R. 952). But, even on that occasion, the plaintiff complied with the doctor's instructions. (R. 952). The latter occasion was when plaintiff was taken to the hospital after being shot in a street altercation. He wanted to be released against medical advice and seek treatment elsewhere, complaining that he was being treated

---

[5] It is unclear whether it is the plaintiff's position that everyone who commits a violent crime is disabled due to a mental impairment and entitled to SSI. If that is the claim, it is as unsupported as it is unsupportable.

like a kid. When the doctor saw him, he was not agitated, and his affect was calm. (R. 1352). Against these two incidents over a span of five years, as the ALJ pointed out (R. 24), the plaintiff's cousin allowed him to live with her and her four minor children ages 6 to 16. Arguably, it might be said that plaintiff seems to be able to control his violence, bringing it to bear when needed to engage in criminal activity. In any event, it certainly does not prove what the applicant insists the only – or even the most likely – conclusion to be drawn from these incidents is. It certainly was not enough to persuade the ALJ, and there is no basis for rejecting the ALJ's conclusions in this case.

**B.**

Plaintiff next argues that the ALJ's residual functional capacity finding is not supported by substantial evidence, either from a physical or mental standpoint. From a physical standpoint, plaintiff claims the evidence shows he cannot operate buttons or zippers, wash himself, prepare food, fold clothes at a normal pace. [Dkt. #19, at 11-12]. But, again, these are just claims, and claims are not enough. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(c); *Zoch*, 981 F.3d at 601; 42 U.S.C. § 423(d)(5)(A); *Karr*, 989 F.3d at 513; *Scheck*, 357 F.3d at 702. Plaintiff points to no medical evidence to show he cannot do these things, and it was up to him to do so. *See Gedatus*, 994 F.3d at 905 ("Besides, [plaintiff] has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations."); *Jozefyk*, 923 F.3d at 498 ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations ... because he hypothesizes none" and "the medical record does not support any."). On the contrary, in the main, musculoskelatal and neurological exams have been normal.

15

From a mental impairment standpoint, the discussion in the previous section adequately disposes of plaintiff's argument. But, additionally, as plaintiff concedes, the ALJ based his finding as to plaintiff's mental RFC on the opinions from the state agency examiners. The state agency reviewer's opinions provide substantial evidence to support the ALJ's RFC. *See, e.g., Pavlicek*, 994 F.3d at 783; *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018).

## C.

Finally, plaintiff argues that the number of jobs the vocational expert testified were available in the three examples – 34,300, 12,600, and 5,300 in the national economy, for a total of 52,200 jobs – were insignificant. But, it is not a compelling argument. As few as 174 jobs in the local economy has been held to be significant, and it is well-settled that 1,000 jobs is a significant number, *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009), strongly suggesting that an extrapolation to 52,000 nationally – approaching 500 times that 174 number and 50 times that 1,000 number – should be found adequate. Indeed, more recently, the Seventh Circuit described a figure of 30,000 jobs nationally as "enough." *Mitchell v. Kijakazi*, _F.4th_, 2021 WL 3086194, at *3 (7th Cir. 2021). And, it has to be said that, focusing exclusively on holdings from other districts, the plaintiff completely ignores cases from this district routinely finding fewer jobs than 52,000 to be significant. *See Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. 2019) (17,700 jobs "a significant number of jobs in the national economy"); *Iversen v. Berryhill*, 2017 WL 1848478, at *5 (N.D. Ill. 2017)(finding the job of waxer for which 1,000 waxer positions existed in Illinois and 30,000 existed in the nation a job that alone sufficed to support the ALJ's Step Five determination); *Joseph M. v. Saul*, 2019 WL 6918281, at *17 (N.D. Ill. 2019) (finding that positions which accounted for 40,000

16

jobs nationally were enough to support the ALJ's alternative Step Five findings).

**D.**

Essentially, the plaintiff asks the court to reject the ALJ's fact-finding and to take the view of the record that plaintiff's inconsistent statements were the result of confusion rather than evidence of exaggeration or mendacity. Apart from the fact that, "unfortunately... saying so doesn't make it so," *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010),[6] the argument misperceives the role of the ALJ and a reviewing court.

The purpose of a trial – any trial – is to ascertain the truth, *Darden v. Wainwright*, 477 U.S. 168, 194 (1966), and to do so "the fact-find[er]... must hear both truthful and false witnesses." *In the Matter of Michael*, 326 U.S. 224, 227-28 (1945). In the context of a Social Security case it is the ALJ who decides disputed issues of credibility and it is not for a reviewing court to second guess otherwise proper credibility determinations of the ALJ. *Reynolds v. Kijakazi*, – F.4th –, –, 2022 WL 291721, at *3 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021); *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019). But, in effect, that is what the plaintiff is subtly asking the court to do in. Plaintiff's view may be that his contradictions and inconsistent statements were due to his confusion and his mental impairment; but it was for the ALJ in assessing the facts revealed on this record to make that determination. In this case, there is no basis for concluding that the ALJ did not act legitimately in making necessary credibility determinations. The ALJ properly found that the plaintiff did not tell the truth when it was to his benefit not to do so and to exaggerate

---

[6] *Accord Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020); *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018).

17

when he thought it beneficial. Showing up to an agency exam in a wheelchair, for example. ALJs are required to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2017 WL 5180304, at *6. Claimants have an obvious incentive to exaggerate or even lie to ALJs. *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). It for ALJs to make proper credibility determinations. The ALJ did so here. Plaintiff and his lawyer may not agree with the judgments the ALJ made, but that does not mean that those judgments were not proper and within the scope of the ALJ's authority.

Plaintiff began this case with a misrepresentation on his *in forma pauperis* application, and the record before the ALJ was replete with inconsistent statements from the plaintiff. The *coup de gras* was his wheelchair appearance at his consultative examination with Dr. Levitan. This was perhaps an instance where an appeal of the Commissioner's decision ought not to have been "a conditioned reflex." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1202 (7th Cir. 1987)(quoting 1 Jessup, Elihu Root 133 (1938)). After all, not every Social Security Supplemental Security Income denial needs to be brought to federal court. Clearly, the ALJ got this one right.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #24] is granted, and the ALJ's decision is affirmed.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/14/22

18

19